UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| THE AGAVE PROJECT LLC, d/b/a THORNTAIL, and JOELVANDENBRINK, INDIVIDUAL, | ) ) ) | No. 23-1984 |
| | ) | |
| Plaintiff, | ) ) | **COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| v. | ) ) | |
| HOST MASTER, 1337 SERVICES LLC, a ST. KITTS and NEVIS COMPANY, and a DOE, an individual, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## I.   INTRODUCTION

1.     Plaintiffs, The Agave Project LLC, d/b/a Thorntail Hard Agave ("Thorntail"), and Joel VandenBrink ("VandenBrink"), bring this suit to stop Defendants, Host Master 1337 LLC and a Doe, from cybersquatting on the domain "thorntailhardagave.com" and using this domain, as well as mirror websites, to publish false, defamatory, and disparaging content about Thorntail and VanderBrink with the intent to interfere with Plaintiffs' business.

## II.   PARTIES

COMPLAINT - 1129645.0002/8075328.1

LOWE GRAHAM JONES PLLC

1325 Fourth Avenue, Ste. 1130
Seattle, Washington 98101
206.381.3300 • F: 206.381.3301

2.      The Agave Project LLC is a Washington corporation with its principal place of business in Seattle, Washington.

3.      Joel VandenBrink is an individual who resides in Seattle, Washington.

4.      On information or belief Host Master 1337 LLC is a St. Kitts and Nevis Company that operates an anonymization service working in concert with Doe to register and maintain one or more malicious websites.

5.      On information or belief Doe is an individual or entity working in concert with Host Master 1337 LLC to create and maintain the malicious websites.

### III.     JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. § 1125.

7.      This Court has supplemental jurisdiction over Plaintiffs' state and common-law claims pursuant to 28 U.S.C. § 1367(a), because the claims form part of the same case and controversy and derive from a common nucleus of operative facts.

8.      The Court has personal jurisdiction over all Defendants because they committed tortious acts within and directed at the State of Washington. Additionally, Defendants have committed intentional acts with actual or constructive knowledge that they would cause substantial injury to Plaintiffs and their business relationships in Washington.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred in the Western District of Washington, where Thorntail is registered and VandenBrink resides.

COMPLAINT - 2129645.0002/8075328.1

10.     Pursuant to Local Civil Rule 3(d), intra-district assignment to the Seattle Division is proper, because the claims arose in this Division, where (a) Plaintiffs reside, (b) a substantial part of the injuries giving rise to suit occurred, and (c) Defendants directed their unlawful conduct.

## IV.     FACTS

### The Thorntail Hard Agave Brand

11.     Thorntail is an alcohol beverage company incorporated in March of 2023 by Vanderbrink.  Thorntail has developed a hard cider fermented agave beverage and the related brand THORNTAIL HARD AGAVE.

12.     Since at least as early as March of 2023, Plaintiffs secured trademark rights in the THORNTAIL HARD AGAVE trademark. Plaintiffs accrued such rights by offering for sale, securing an agreement for distribution of, and continuing to market and promote its hard-cider products under the brand name THORNTAIL HARD AGAVE since at least as early as March 2023.

13.     For example, in March 2023, Plaintiffs delivered samples of its hard-cider products made under the brand name THORNTAIL HARD AGAVE to Columbia Distributing of Kent, Washington, resulting in an agreement to purchase and take delivery for resale certain quantities of the branded hard cider in late December or early January 2024.  Copies of two purchase orders fulfilling that agreement are attached as Exhibit 1.

14.     As a further example, Thorntail's hard-cider products also have been reviewed by users of Untappd, an application that allows users to check in and rate alcoholic beverages. A copy of examples of those reviews is attached as Exhibit 2.

COMPLAINT - 3129645.0002/8075328.1

LOWE GRAHAM JONES PLLC

1325 Fourth Avenue, Ste. 1130
Seattle, Washington 98101
206.381.3300 • F: 206.381.3301

15.     As a further example, Thorntail maintains the website "drinkthorntail.com" marketing their Thorntail Hard Agave products. A printout of the website's landing page is attached as Exhibit 3.

16.     Plaintiffs have never licensed, affiliated with, or otherwise authorized any person or entity in any jurisdiction worldwide to use its THORNTAIL HARD AGAVE trademark in the form of a domain name.

**VandenBrink's Experience in the Alcohol Beverage Industry**

17.     Plaintiff VandenBrink has relationships in the alcoholic-beverage industry, including but not limited to relationships related to founding and running successful alcoholic-beverage companies Two Beers Brewing Co. and Seattle Cider Co.

18.     Around 2016, VandenBrink's companies Two Beers Brewing Co. and Seattle Cider Co. were sold to Agrail Group.

19.     Beginning around 2019, a dispute related to the sale arose, with both sides alleging, among other things, breach of contract.

20.      In June of 2020, the case was fully settled and dismissed with prejudice.

**Defendants' Malicious Actions**

21.     On information or belief, Defendants knew of Plaintiffs' relationships in the alcoholic-beverage industry Plaintiffs' and use of the THORNTAIL HARD AGAVE trademark.

22.     On information and belief, Defendant Doe has business interests related to the alcoholic-beverage and hard-cider industry.

23.     In May of 2023—after Plaintiffs had accrued its rights by offering for sale, securing an agreement for distribution of, and continuing to market and promote

COMPLAINT - 4129645.0002/8075328.1

THORNTAIL HARD AGAVE—Defendants created the "thorntailhardagave.com" registration (the "Infringing Domain Registration").

24.     On information and belief, around the same time, Defendants created the "kompletedesignbuild.com" registration. And later in August of 2023, Defendants created the "anonimcard.com" registration.

25.     Defendants are not using the "thorntailhardagave.com" domain name to provide a bona fide offering of goods or services or for any legitimate non-commercial or fair use.

26.     Defendants have never used the name, "Thorntail Hard Agave," in connection with any offering or sale of a bona fide good or service.

27.     Defendants are using the "thorntailhardagave.com" domain name, the "kompletedesignbuild.com" domain name, and the "anonimcard.com" domain name (the "Defamatory Websites") to display various inflammatory and false statements and images presented to cause harm to Thorntail and VandenBrink by interfering with Plaintiffs' relationships in the alcoholic-beverage industry and harming Plaintiffs' reputation.

28.     Defendants' malicious intent for the registration of the "thorntailhardagave.com" is evidenced by the HTML code for the "thorntailhardagave.com" website (the "Infringing Website"), which includes the words, "FUCK YOU JOEL."

29.     Defendants' intent to harm Thorntail is evidenced by text and imagery on the Defamatory Websites' false representations that Thorntail Hard Agave is urine, is

LOWE GRAHAM JONES PLLC

1325 Fourth Avenue, Ste. 1130
Seattle, Washington 98101
206.381.3300 • F: 206.381.3301

unoriginal, that funding for Thorntail will be used for drugs, and that Thorntail is otherwise unreliable.

30. Defendants' intent to harm VandenBrink's reputation and business interests are evidenced by the Defamatory Websites' false representations that VandenBrink is an alcoholic and a cocaine addict and that he conducts illegal activity.

31. On information or belief, Defendant Doe's intent is to profit by interfering with Plaintiffs' ability to compete in the hard-cider industry.

32. The marks used in the Infringing Domain Name and Infringing Website are identical or confusingly similar to Plaintiffs' Trademark.

### Defendants' Efforts to Cover Their Tracks

33. Doe has taken steps to cover their tracks and avoid being held responsible for their malicious misconduct. Specifically, Doe chose a registrar, Tucows, that has a history of non-compliance with valid takedown requests from trademark holders. *See* Ex. 4 at p. 16 ("Based in Canada, Tucows is reportedly an example of a registrar that fails to take action when notified of its clients' infringing activity.").

34. Tucows Domains, contrary to express agreements with The Internet Corporation for Assigned Names and Numbers ("ICANN"), hid the Infringing Domain Name registrant's information on the Whois database. To engage in domain name registration, a registrar is required to enter into agreements with ICANN that obligate the registrar to ensure accurate and current data in the "Whois database," which provides information about domain-name owners to enable members of the public to contact the domain-name owners about technical and legal issues related to those domain names. Here, however, the Whois database provided no registrant information for the Infringing Domain Name.

35.     Therefore, to even learn who the registrant of the Infringing Domain was, Plaintiffs were forced to institute an action with the World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center pursuant to the UDRP.

36.     Eventually, pursuant to mandatory requests under the UDRP, Tucows Domains disclosed the registrant information, only to reveal that there was yet another layer of identity concealment employed by Doe.

37.     Instead of registering with Tucows himself, Doe used an intermediary, Host Master 1337 LLC, based in the near-judgment-proof territory of St. Kitts and Nevis. Host Master 1337 sits between the domain-name-registration service (Tucows) and Host Master 1337, serving as the actual controller of the domain name and thus acting as a privacy shield.

38.     Plaintiffs have attempted to have the "thorntailhardagave.com" registration transferred through a UDRP arbitration process. Defendants failed to submit a response to the complaint. Nonetheless, the single arbitrator (a Solicitor based in Australia) denied the request based on a finding that "Thorntail" had not acquired secondary meaning—a conclusion manifesting a disregard of the law, which clearly does not require secondary meaning for an inherently distinctive, non-descriptive trademark. The arbitrator declined even to consider whether Thorntail is an inherently distinct, non-descriptive mark. The arbitrator also did not consider that Plaintiffs had received the purchase order agreed to in March of 2023, and the arbitrator's award was made before public review of Plaintiffs' products on the Untappd application.

39.     The filing of this action is a last resort and presents the only hope that Plaintiffs will be able to control a domain that is identical to their Trademark and stop the ongoing publication of various inflammatory and false statements and images presented

LOWE GRAHAM JONES PLLC

1325 Fourth Avenue, Ste. 1130
Seattle, Washington 98101
206.381.3300 • F: 206.381.3301

to cause harm to Thorntail and VandenBrink and will continue to cause substantial damage to their reputation, goodwill, and business unless and until this Court intervenes.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Declaratory Judgment

40.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

41.    Plaintiffs have the right to register and use the "thorntailhardagave.com" domain for the reasons set forth above.

42.    Defendants have registered the domain without any legitimate purpose and used it unlawfully to disparage Plaintiffs and harm their business.

43.    An actual controversy exists with respect to the right to registration of the "thontailhardagave.com" domain.

44.    Plaintiffs are entitled to a declaration of their rights with respect to the "thorntailhardagave.com" domain under 28 U.S.C. § 2201(a).

### SECOND CAUSE OF ACTION

#### Common Law Trademark Infringement

45.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

46.    Plaintiff Thorton has a valid and legally protectable Trademark in THORNTAIL HARD AGAVE.

47.    Plaintiff Thorntail owns the Trademark THORNTAIL HARD AGAVE.

COMPLAINT - 8129645.0002/8075328.1

48.    Defendants' use of the domain "thorntailhardagave.com" to display various inflammatory and false statements and images, or other content, is likely to confuse consumers.

### THIRD CAUSE OF ACTION

### Cybersquatting

49.    Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

50.    Defendants have registered and are trafficking in, using, and maintaining an internet domain name incorporating and imitating Plaintiffs' trademark, with bad faith intent to profit by interfering Plaintiffs' ability to compete in the hard cider industry.

51.    Plaintiffs' Trademark is inherently distinctive and was used in commerce before Defendants registered the Internet domain name identified in the Complaint.

52.    The mark used in the Infringing Domain Name and Infringing Website are identical and/or confusingly similar to the Plaintiffs' Trademark.

53.    Defendants do not have any intellectual property or other rights in the name "Thorton Hard Agave."

54.    Defendants have never made any use of the name, "Thorton Hard Agave," in connection with the offering or sale of any bona fide good or service.

55.    Defendants have never made any bona fide fair use of the name, "Thorton Hard Agave," on any website.

56.    Defendants registered and used the Infringing Domain Name and Infringing Website to divert consumers and potential business partners from Plaintiffs' business for Defendants' commercial gain.

COMPLAINT - 9129645.0002/8075328.1

57.     By their acts aforesaid, Defendants have violated the Anticybersquatting Consumer Protection Act ("ACPA"), Pub. L. No. 106-113, 113 Stat. 1501 (1999), codified at Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), causing irreparable injury to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

### FOURTH CAUSE OF ACTION

### Defamation

58.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

59.     Defendants have and are displaying false statements about Plaintiff VanderBeck through the Defamatory Websites identified in the Complaint.

60.     Defendants have caused harm to Plaintiff VanderBeck through these statements including to his reputation and business interests.

61.     Defendants have actual malice or reckless disregard of the truth by displaying the content on the Defamatory Websites.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

### FIFTH CAUSE OF ACTION

### Business Disparagement

62.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

COMPLAINT - 10129645.0002/8075328.1

63.     Defendants have and are displaying false statements about Plaintiff Thorntail on the Defamatory Websites identified in the Complaint.

64.     Defendants have caused harm to Plaintiff Thorntail through these statements, impacting the ability to raise capital and secure orders through their relationships in the alcoholic-beverage industry.

65.     Defendants' statements were made with actual malice or reckless disregard for the truth by displaying the content on the Defamatory Websites.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in the Prayer for Relief.

## SIXTH CAUSE OF ACTION

### Tortious Interference with Business Expectancy

66.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

67.     Plaintiffs have a valid business expectancy in developing the THORNTAIL HARD AGAVE brand using their relationships in the alcoholic-beverage industry.

68.     On information or belief, Defendants had knowledge of Plaintiffs' efforts to develop the THORNTAIL HARD AGAVE brand through the relationships Plaintiffs have in the alcoholic-beverage industry.

69.     Defendants intentionally induced these relationships with the beverage industry to terminate their business with Plaintiffs.

70.     Defendants are using the improper means of false and malicious statements displayed on the Defamatory Websites and using the Infringing Domain to induce these relationships in the alcohol beverage industry not to do business with Plaintiffs.

COMPLAINT - 11129645.0002/8075328.1

LOWE GRAHAM JONES PLLC

1325 Fourth Avenue, Ste. 1130
Seattle, Washington 98101
206.381.3300 • F: 206.381.3301

71.     The conduct is a proximate cause of damage to Plaintiffs.

## SEVENTH CAUSE OF ACTION

### Washington State Unfair Competition

72.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

73.     Defendants have engaged, and are engaged, in unlawful unfair competition under RCW 19.86.020, causing irreparable injury to Plaintiffs and the public.

## EIGHTH CAUSE OF ACTION

### Civil Conspiracy

74.     Plaintiffs incorporate by reference all of their allegations in Paragraphs 1 through 39.

75.     This Court has original jurisdiction over this pendent claim pursuant to 28 U.S.C. § 1338(b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

76.     Upon information and belief, Host Master 1337 LLC and Doe acted in concert pursuant to an oral or written agreement to commit the violations of law detailed herein.

77.     Host Master 1337 LLC and Doe performed in accordance with their mutual agreement to perpetrate violations of state and federal law as detailed herein and to further their conspiracy to harm Plaintiffs' business in an effort to obtain an unfair competitive advantage and profit off of their conduct.

78.     Defendants' conduct has caused substantial emotional and pecuniary harm and injury to Plaintiffs, and has caused, and will continue to cause, irreparable harm to Plaintiffs unless enjoined.

LOWE GRAHAM JONES PLLC

1325 Fourth Avenue, Ste. 1130
Seattle, Washington 98101
206.381.3300 • F: 206.381.3301

## VI.     JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

## VII.     PRAYER FOR RELIEF

Based on the foregoing, Plaintiff requests orders and/or a judgment awarding the following relief:

A.     A temporary restraining order, preliminary injunction, and permanent injunction against Defendants, collectively and individually, and their officers, shareholders, partners, principals, agents, assignees, beneficiaries, successors, licensees, distributors, attorneys, proxies, alter egos, aliases, and all other persons acting in concert with Defendants collectively or individually:

1.  Prohibiting them from registering or using as a trade name, trademark, service mark, Internet domain name, e-mail address, or portion thereof, any name or term that incorporates, imitates, or is confusingly similar to Thorntail Hard Agave;

2.  Requiring them to take down the kompletedesignbuild.com, and anonimcard.com, site and refrain from publishing it in the future;

3.  Prohibiting them from publishing or disseminating false statements about Plaintiffs on Defamatory Websites.

4.  Ordering that the "thorntailhardagave.com" domain be transferred to Plaintiffs.

B.     Declaratory relief establishing that Thorntail is entitled to register the

COMPLAINT - 13129645.0002/8075328.1

1   "thorntailhardagave.com" domain.

2   C.   Damages in an amount to be proved at trial for the harm done to Plaintiffs'

3        reputation and business, including business expectancies and lost profits, in

4        an amount not less than $75,000.

5   D.   An award of the costs incurred in this action, including reasonable

6        attorneys' fees.

7

8   E.   For such other and further relief, at law or in equity, as the Court deems

9        just and proper based on the facts as established at trial or otherwise.

10

    Dated this 22nd day of December, 2023

11

12

13                              LOWE GRAHAM JONES PLLC

14

15                              Mitchell D. West, WSBA #53013
                                Mark Walters, WSBA #30819
16                              walters@lowegrahamjones.com
                                1325 Fourth Avenue, Suite 1130
17                              Seattle, WA 98101
                                Tele: 206.381.3300
18

19

20

21

22

23

24

25

26

COMPLAINT - 14129645.0002/8075328.1

# EXHIBIT 1

```
12/14/2023          P U R C H A S E   O R D E R      P.O. 1000028129

TO:                                 SHIP TO:
THE AGAVE PROJECT LLC               COLUMBIA DISTRIBUTING
THORNTAIL                           COLUMBIA DISTRIBUTING
4701 SW ADMIRAL WAY #59             2525 SE 1ST AVE
SEATTLE          WA 98116           CANBY           OR 97013

W/H# 10    SUPPLIER T8 THORNTAIL              PURCH ORDER # 1000028129
ORDER DATE 12/14/23    SHIP DATE 12/22/23  ARRIVAL DATE 12/22/23

CARRIER
-----------------------------------------------------------------------------
                                                         FOB
CDC#      BREW#        BRAND        PACKAGE        QTY   -PA      EXTND
-----------------------------------------------------------------------------
11153                  THORNTAIL    C 2/12 VARIETY  500   23.70   11850.00
42766                  MISC     DUN 4WAY PALLET #1    1   11.00      11.00
**                                                  501           11861.00
```

```
**TOTALS:   501       QTY.,  1125.00 GALLONS,                      .00
                             10200.00 POUNDS,      850.0 CUBE

FOR QUESTIONS ON THIS ORDER PLEASE CALL AT 000 000-0000
PLEASE INCLUDE P.O. NUMBER ON ALL INVOICES, PACKAGING, ETC.
```

```
12/14/2023            P U R C H A S E   O R D E R       P.O. 2121174885

TO:                               SHIP TO:
THE AGAVE PROJECT LLC             COLUMBIA DISTRIBUTING
THORNTAIL                         COLUMBIA DISTRIBUTING
4701 SW ADMIRAL WAY #59           20301 59TH PLACE SOUTH
SEATTLE         WA 98116          KENT            WA 98032

W/H# 21        SUPPLIER THORNTAIL     PURCH ORDER # 2121174885
ORDER DATE 12/14/23 SHIP DATE 12/22/23 ARRIVAL DATE 12/22/23
CARRIER
-----------------------------------------------------------------------
```

| CDC#  | BREW# | BRAND     | PACKAGE           | QTY | FOB   | EXTND    |
|-------|-------|-----------|-------------------|-----|-------|----------|
| 11153 |       | THORNTAIL | C 2/12 VARIETY    | 500 | 21.83 | 10915.00 |
| 42766 |       | MISC  DUN | 4WAY PALLET #1    | 1   | 11.00 | 11.00    |
| **    |       |           |                   | 501 |       | 10926.00 |

```
**TOTALS:   501      QTY.,   1125.00 GALLONS,                        .00
                             10200.00 POUNDS,        850.0 CUBE

----------------
```

# EXHIBIT 2



Noble Ridge Tree Farm

Delicious. A new favorite. The lime and salt balance perfectly.

⭐⭐⭐⭐⭐



| 💬 Comment | 📄 Toast |
|:---:|:---:|

13 Dec 23   View Detailed Check-in   Delete Check-In

**UNTAPPD**  Blog  Top Rated  Insiders  Help  Store

 **K Brady Hubert** is drinking a **Peach Strawberry** by **Thorntail**  

Yummy. Great match of the peach and strawberry.

⭐⭐⭐⭐⭐

🟢 Earned the Style Quest: Hard Seltzer badge!

① Earned the Newbie badge!



| 💬 Comment | 🍺 Toast |
|---|---|

13 Dec 23   View Detailed Check-In   Delete Check-In

 **K Brady Hubert** is drinking a Passionfruit Guava by Thorntail at Kitsap Forest Theater 

This might be my favorite of the 3. So good.

⭐⭐⭐⭐⭐



💬 Comment | 📄 Toast

13 Dec 23   View Detailed Check-in   Delete Check-In

 **K Brady Hubert** is drinking a Peach Strawberry by Thorntail 

Yummy. Great match of the peach and strawberry.



10 hours ago   View Detailed Check-in

 **Dani O'Connor** is drinking a **Peach Strawberry** by **Thorntail** 

This will be my drink of choice all summer long! Its flavor is crisp and light; it's the perfect drink on a warm day.



🟢   Earned the Style Quest: Hard Seltzer badge!

①   Earned the Newbie badge!

11 hours ago   View Detailed Check-in

 **John Dunham** is drinking a **Sea Salt Lime** by **Thorntail** at **North Spokane RV Campground** 

Good cocktail in a can sort of thing. Normally since I am a man I normally only drink manly American beers like Scotch ales, but this one's kind of fun while blasting the Jimmy Buffett and watching the wife clean up after the dogs.



12 hours ago   View Detailed Check-in

**Fred Hammerquist** is drinking a Sea Salt Lime by Thorntail at 

Had a chance to discover Thorntail Hard Agave on our recent van trip. Super crisp and delicious. Great companion for holding down our beach chairs.

⭐⭐⭐⭐◐

🎖 Earned the Style Quest: Hard Seltzer badge!

🎖 Earned the Beer Gathering badge!

🎖 Earned the Beer Party badge!

🎖 Earned the Newbie badge!

🎖 Earned the Untappd at Home badge!



10 hours ago   View Detailed Check-in

 Ken Bounds is drinking a Sea Salt Lime by Thorntail at Untappd at Home

Thorntail has produced a new crisp & refreshing drink - unique flavors blended with fermented agave juice. You gotta try 'em. Enjoyed all three!

⭐⭐⭐⭐⭐

Earned the Style Quest: Hard Seltzer badge!

Earned the Beer Gathering badge!

Earned the Beer Party badge!

Earned the Newbie badge!

Earned the Untappd at Home badge!



 Steve Douglass is drinking a Sea Salt Lime by Thorntail 

I was really surprised by the Sea Salt- really crisp and zero after taste residue.

⭐⭐⭐⭐⭐

Earned the Style Quest: Hard Seltzer badge!

Earned the Newbie badge!

6 hours ago    View Detailed Check-in

---

 Ralph Cramden is drinking a Passionfruit Guava by Thorntail at Untappd at Home 

VERY interesting! Way better than any seltzer I've tasted. The other flavors are just as good.

Earned the Style Quest: Hard Seltzer badge!

Earned the Beer Gathering badge!

Earned the Beer Party badge!

Earned the Newbie badge!

Earned the Untappd at Home badge!

Earned the Cheers To You! (Level 6) badge!

10 hours ago    View Detailed Check-in

 **Steve Douglass** is drinking a Sea Salt Lime by Thorntail 

I was really surprised by the Sea Salt- really crisp and zero after taste residue.

⭐⭐⭐⭐⭐

Earned the Style Quest: Hard Seltzer badge!

Earned the Newbie badge!

6 hours ago    View Detailed Check-in

 **Ralph Cramden** is drinking a Passionfruit Guava by Thorntail at Untappd at Home 

VERY interesting! Way better than any seltzer I've tasted. The other flavors are just as good.

Earned the Style Quest: Hard Seltzer badge!

Earned the Beer Gathering badge!

Earned the Beer Party badge!

Earned the Newbie badge!

Earned the Untappd at Home badge!

Earned the Cheers To You! (Level 6) badge!

10 hours ago    View Detailed Check-in



**Willy Berry** is drinking a *Sea Salt Lime* by *Thorntail* at *Untappd at*



★★★★★

🥫 **Can**


Earned the Style Quest: Hard Seltzer badge!


Earned the Cheers To You! (Level 3) badge!

an hour ago    View Detailed Check-in



**Linda Gorton** is drinking a *Peach Strawberry* by *Thorntail*



I love the light fresh flavor of this drink and the fact that all ingredients are natural. The level of carbonation is perfect for my tastebuds.

★★★★★

Earned the Style Quest: Hard Seltzer badge!

Earned the Newbie badge!





A trend-setting beverage with an ideal balance of flavor and carbonation. It goes down easily, especially given its unique and pleasing taste. This newcomer is gonna be in high demand. SO good!

●●●●●

 Earned the Style Quest: Hard Seltzer badge!

 Earned the Newbie badge!



26 minutes ago   View Detailed Check-in

# EXHIBIT 3



OUR DRINKS          ABOUT HARD AGAV

# OUR DRINKS

Experience the Thorntail difference through three delightful and unique drinks designed to elevate your taste buds! Dive in and savor the exceptional flavors crafted just for you.





OUR DRINKS    ABOUT HARD AGAV

## MADE FROM
## FERMENTED BLUE AGAVE







## PASSIONFRUIT GUAVA

**EXPLORE FLAVOR**

## SEA SALT LIME

**EXPLORE FLAVOR**



OUR DRINKS     ABOUT HARD AGAV



# ALL 3 OF OUR DRINKS ARE AVAILABLE TO PURCHASE IN 6-PACKS OR OUR VARIETY PACK.

**FIND IN STORES**

## TESTIMONIALS

Thorntail Hard Agave aligns flawlessly with my weekday and weekend vibe! Its invigorating flavors add a unique zest to my evenings, whether I'm winding down after a yoga session or infusing a lively spirit into gatherings with friends. It's that perfect sip that brings a

Thorntail Hard Agave is my go-to companion, whether I'm seeking a bold twist during outdoor escapades or simply unwinding after a day filled with adventures with friends

**MILES PARKER**

Thornta
of mir
perf
conscio
keep a c
—it's alw

FI



OUR DRINKS    ABOUT HARD AGAV

# FIND US IN STORES

SEE WHERE WE'RE AT

FAQS    CONTACT

© Thorntail Hard Aga

# EXHIBIT 4

# 2014 Out-of-Cycle Review of Notorious Markets



# United States Trade Representative
## March 5, 2015

# Results of the 2014 Out-of-Cycle Review of Notorious Markets

### **Overview**

Commercial scale trademark counterfeiting and copyright piracy cause significant financial losses for rights holders and legitimate businesses, undermine critical U.S. comparative advantages in innovation and creativity to the detriment of American workers, and can pose significant risks to consumer health and safety.  The Notorious Markets List ("List") highlights select online and physical marketplaces that reportedly engage in and facilitate substantial copyright piracy and trademark counterfeiting.[1]

The Office of the United States Trade Representative ("USTR") has developed the List under the auspices of the annual Special 301 process.[2]  USTR solicited comments regarding which markets to highlight in this year's List through a *Request for Public Comments* published in the *Federal Register* (*www.regulations.gov*, Docket Number USTR-2014-0017).

The List is based on publicly-available information.  USTR selected markets not only because they exemplify global concerns about counterfeiting and piracy, but also because the scale of infringing activity in such markets can cause economic harm to U.S. IPR holders.  Some of the identified markets reportedly host a combination of legitimate and unauthorized activities.  Others reportedly exist solely to engage in or facilitate unauthorized activity.  The List does not purport to be an exhaustive list of all physical and online markets worldwide in which IPR infringement takes place.

USTR has identified Notorious Markets in the Special 301 Report since 2006.  In 2010, USTR announced that it would begin publishing the List separately from the annual Special 301 Report, pursuant to an Out-of-Cycle Review ("OCR").  USTR first separately published the List in February 2011.  The present List is the result of the 2014 OCR of Notorious Markets.

---

[1] The terms "copyright piracy" and "trademark counterfeiting" appear below as "piracy" and "counterfeiting," respectively.

[2] Please refer to the <u>Public Information</u> section below for links to information and resources related to Special 301.

The List does not purport to reflect findings of legal violations, nor does it reflect the U.S. Government's analysis of the general IPR protection and enforcement climate in the country concerned. A broader analysis of IPR protection and enforcement in particular countries or economies is presented in the annual Special 301 Report, published on or about April 30thof each year (please refer to the Public Information section at the end of this document).

The List repeats several previously-identified markets because our concerns with those particular markets have not been addressed. However, we examined each market anew and updated each listing. Other previously-identified markets may not appear in the present List for a variety of reasons, including that: the market has closed or its popularity or significance has diminished; enforcement or voluntary action has reduced or eliminated the prevalence of IPR-infringing goods or services; market owners or operators are cooperating with rights holders or government authorities to address infringement; the market is no longer the most noteworthy example of its kind; or no commenter nominated the market for continued inclusion on the List.

### Positive Developments Since the 2013 Out-of-Cycle Review of Notorious Markets

Since the release of the 2013 List, some market owners and operators have made notable efforts to address the widespread availability of pirated or counterfeit goods in their markets. The United States commends these efforts, and encourages governments, rights holders, and the owners and operators of these and other markets, including those newly identified in the 2014 List, to engage in sustained and meaningful efforts to combat piracy and counterfeiting. For example, the operators of previously-listed **Seriesyonkis.com**[3] reportedly have taken voluntary action to reduce the availability of pirated content on the site following the commencement of criminal proceedings in Spain.[4] The operators of **Aiseesoft.com** voluntary ceased offering DVD and Blu-Ray "ripping" software after the site appeared in the 2013 List. Such welcome efforts

---

[3] Previously- and presently-listed markets appear in **bold** type. When a paragraph includes multiple references to a market only the first instance will appear in **bold** type.

[4] On January 1, 2015, Spain's new copyright law came into force. The law provides, among other things, significant penalties for unauthorized distribution of copyright-protected content. Reportedly in anticipation of the effective date of the law, several sites popular in Spain either reduced the availability of pirated content or ceased operations. This welcome response will create more opportunities for legitimate content distribution in Spain.

can foster the development of legitimate marketplaces and business models, enhance consumer choice and security, and facilitate the next generation of creativity and innovation.

During the past year, some of the listed online markets undertook various measures that demonstrated a willingness to cooperate in addressing infringement, such as: providing streamlined notice and takedown procedures; expediting responses to complaints; completing licensing arrangements with rights holders; and engaging with rights holders to develop additional cooperative procedures. China's **Xunlei.com** ("Xunlei") has made several notable improvements since first being listed as a Notorious Market. In addition to shutting down its problematic affiliated service, **GouGou**, and transitioning **KanKan** to a legitimate format, Xunlei created a mechanism for reporting unauthorized content, and has entered into agreements with several rights holder organizations to distribute licensed content. However, USTR continues to receive complaints about Xunlei because the expected positive impact of at least some of those agreements with rights holder organizations is not yet apparent, and because Xunlei's broad efforts to date appear not to have effectively addressed the high level of unauthorized content that remains available. In recognition of Xunlei's efforts, and to encourage further improvement by Xunlei and by other Notorious Markets, USTR has removed Xunlei from the List for 2014. However, we will continue to monitor developments. USTR encourages sites such as Xunlei and listed site **Zing.vn** to deepen engagement with rights holders and to further ensure authorized use of content on their online markets.

In 2014, several previously-listed online markets closed or experienced disruption as a result of enforcement efforts. These include: **Wawa-mania.ec**, which was the focus of action by French authorities; **Kuaibo.com/QVOD** in China; and **Mp3skull.com** and **Share-rapid.cz**,[5] as a result of actions by the United Kingdom ("U.K.") and other governments as well as civil enforcement by rights holders.

In 2014, other previously-listed or nominated sites were the subject of significant domestic and international law enforcement efforts. Notable enforcement efforts occurred in Sweden, against

---

[5] Because **Share-rapid.cz** may have resumed operations as MegaRapid.cz, USTR will continue to monitor the new site for potential IPR infringement.

**ThePirateBay.se**[6] and in Germany, against the nominated but not listed site Boerse.bz (also operating as Kinox.to).[7] The Government of Spain also took significant enforcement action in 2014 against Seriespepito.com and **A Pedra Market**, a physical market in Vigo, Galicia. In addition, United States and European enforcement authorities cooperated in several enforcement actions against online markets, and the Italian Fiscal Police and Rome's public prosecutor joined forces against hundreds of sites delivering pirated content to Italian consumers. The United States commends these efforts and encourages trading partners to continue their individual and cooperative efforts to combat copyright piracy and trademark counterfeiting.

**Putlocker.com** was subject to various enforcement actions in 2012 and 2013. In 2014, the owner rebranded the cyberlocker as Firedrive.com, and reportedly continued to offer both streaming and downloading of unauthorized video files, including preserved Putlocker files. It is unclear whether the owner has maintained any of the anti-piracy controls previously instituted at Putlocker.com, or rather has returned to its past practices of improperly incentivizing and compensating users for illegal uploads. In any event, Firedrive's popularity has decreased dramatically from that of the original Putlocker.com site. Firedrive's Alexa.com[8] global rank of 9,842, is significantly lower than Putlocker's February 2014 global rank of 320. Due to this significant reduction in popularity, Putlocker/Firedrive is not listed this year.

Respondents to USTR's *Federal Register Request* describe Brazil's Camelodromo Uruguaiana (Rio de Janeiro) and Feira dos Importados (also known as Feira do Paraguai) (Brasilia) as being at the center of the country's trade in pirated video games and audiovisual products. Reportedly the largest shopping market in Rio de Janeiro, the Camelodromo Uruguaiana hosts over 1,500

---

[6] Vigilance by Swedish and other government authorities is needed to prevent The Pirate Bay ("TPB") from resuming full operations as it did after a 2006 enforcement action against it. Shortly after the December 2014 enforcement action, the site resumed operations as **ThePirateBay.si** and then again as **ThePirateBay.se** as well as under several other domain names. TPB also has been cloned (*i.e.*, substantially identical sites made available under other domain names), including by the operators of Isohunt.to, who also cloned previously-listed **Isohunt.com**. TPB and several clone sites are reportedly using CloudFlare.com's services.

[7] Boerse.bz, like TPB, appears to have resumed operations, as Boerse.to. The resurgence of sites after enforcement actions reinforces the need for not only coordinated but also sustained responses.

[8] Alexa.com utilizes a proprietary methodology to analyze global and country-specific user traffic and develop a numerical rank that indicates a website's popularity relative to other sites. Rankings can change dramatically and quickly. The rankings that appear in this document are current as of March 3, 2015.

kiosks, many of which sell pirated and counterfeit goods. Similarly, the Feira dos Importados offers apparel, fashion accessories, and toys, in addition to audiovisual entertainment products. Many of the counterfeit products sold there are reportedly produced in Asia. However, in contrast with the current situation described below at listed market **Galeria Page (Sao Paulo)**, local authorities in both Brasilia and in Rio de Janeiro reportedly conduct regular enforcement actions at their markets. Also of note is that the enforcement actions in Brasilia and Rio de Janeiro receive press coverage, which promotes crucial public awareness. USTR applauds these efforts, and encourages Sao Paulo's authorities to resume previous levels of enforcement.

Additional positive developments in 2014 took the form of policy and commercial initiatives, as governments and businesses worldwide look for ways to address copyright piracy and trademark counterfeiting. For example, the Government of France continued its inclusive dialogue with stakeholders, resulting in another installment in a series of reports prepared for the Minister of Culture and Communications. Published in May 2014, _Operational Tools to Prevent and Combat Online Infringement_[9] included an informative review of the respective roles that participants in the Internet ecosystem can play in addressing, and developing alternatives to, online piracy. The report highlighted important voluntary initiatives that will be key to reducing online piracy while respecting the rights of law-abiding users. In the United States, a voluntary payment processor initiative,[10] launched as an outgrowth of the U.S. Intellectual Property Enforcement Coordinator's 2010 Strategic Plan, aims to address websites that persist in intentionally selling infringing products. Under the program, participating payment processors have terminated the accounts of nearly 4,000 online merchants. In Italy, a memorandum of understanding between online advertisers and the film and music industries is aimed at reducing

---

[9] _Outils opérationnels de prévention et de lutte contre la contrefaçon en ligne_ is available at _www.culturecommunication.gouv.fr/Ressources/Rapports/Outils-operationnels-de-prevention-et-de-lutte-contre-la-contrefacon-en-ligne_. (English language summary: _http://merlin.obs.coe.int/iris/2014/6/article18.en.html_). Please also see the 2013 _Report on the Prevention of Unlawful Streaming and Direct Downloading_ at _http://hadopi.fr/sites/default/files/page/pdf/Rapportstreaming_eng.pdf_.

[10] Known as "RogueBlock," this payment processor initiative is a "a collaborative effort of the IACC and the payment industry to create a streamlined, simplified procedure for members to report online sellers of counterfeit or pirated goods directly to credit card and payment processing networks." _www.iacc.org/rogueblock.html_.

or eliminating commercial advertising, the largest source of revenues for sites engaged in copyright piracy.[11]

## Other Developments Related to Previously-Listed Markets

USTR continues to monitor markets that have been removed from the List. Markets may be re-listed if there is a change in circumstances, *e.g.*, if a website that ceased to operate as a result of enforcement or other action resumes its unauthorized activities or the corrective actions that merited removal from the List prove inadequate or short-lived.

A goal of the List is to motivate appropriate action on the part of owners and operators in the private sector as well as governments to reduce piracy and counterfeiting. In some cases, the situation in a particular market or geographic area presents unique challenges not effectively addressed in this OCR process.

While the situation in Ukraine has not improved in 2014, the political will to address specific IPR issues appears to have strengthened. The new administration, elected in October 2014, is undertaking efforts to reform the civil service and integrate competent civil society groups in the monitoring of Ukraine's ministries, courts, judiciary, and security services. However, a demonstrated, positive impact has yet to be seen in the IPR sphere. The sale of counterfeit and pirated products in previously-listed **Seventh Kilometer Market (Odessa)**, and the newly-nominated Barabashova Market (Kharkiv) continues unabated. Rights holders did, however, comment positively on the enforcement efforts of Ukrainian officials at the previously-listed **Petrivka Market (Kyiv)**; in recognition of this effort, the market is not listed. USTR encourages Ukrainian authorities to continue their efforts at Petrivka Market, including against "on demand" copying of copyright-protected content. USTR recognizes the particular challenges of enforcement at the Seventh Kilometer and Barabashova Markets, but caution against inaction.

---

[11] For a discussion of domestic initiatives in selected countries, please see the U.K. Intellectual Property Office's February 2015 publication *International Comparison of Approaches to Online Copyright Infringement: Final Report*, available at www.gov.uk/government/uploads/system/uploads/attachment_data/file/404429/International_Comparison_of_Appr oaches_to_Online_Copyright_Infringement.pdf.

The number of online markets reportedly operating in Ukraine and nominated for inclusion in the 2014 List increased relative to 2013. According to reports, the nominated sites are popular sources of unauthorized copyright-protected content in Ukraine and in dozens of countries worldwide. The proliferation of sites offering unauthorized content represents a complicated cybercrime and cybersecurity challenge for Ukrainian officials, and serves as a barrier to entry for legitimate providers that might otherwise consider offering products and services in Ukraine.[12] **Ex.ua** and **Extratorrent.cc** continue to appear in the List as illustrations of this problem.

The Chinese website **Taobao.com** (Alibaba Group) appeared in previous Lists for the widespread availability of counterfeit and pirated goods in its online market. USTR removed Taobao from the List in 2012 in recognition of efforts to address rights holder and consumer complaints. During the 2013 Notorious Markets review, Taobao provided assurances to various stakeholders that it would continue to work with all relevant stakeholders to address remaining issues. In particular, Taobao committed to address concerns raised by software, publishing, and apparel and footwear companies, many of which are small and medium-sized enterprises with limited enforcement resources. In response to the 2014 *Federal Register Request*, Alibaba Group informed USTR that the company, which owns Taobao and T-Mall, continued its efforts to address stakeholders' complaints, including by reportedly removing millions of listings for counterfeit and pirated products manufactured in China and offered for sale and export. In January 2015, the Chinese Government echoed several of the long-standing complaints against these markets in a report issued by the State Administration for Industry and Commerce (SAIC).[13] Press reports indicate that Alibaba and the Government of China will engage in a

---

[12] Access to legitimate alternatives is critical in combatting online piracy. Many governments and rights holders have focused on developing and helping consumers identify legitimate alternatives, for example: *www.wheretowatch.com*; *www.educause.edu/focus-areas-and-initiatives/policy-and-security/educause-policy/issues-and-positions/intellectual-property/legal-sources-onli*; *www.Findanyfilm.com*; *www.Canistream.it*; *www.mesientodecine.com*; and *www.culturaenpositivo.mecd.gob/es*.

[13] The SAIC report is no longer available on the SAIC website. According to unofficial translations of the report (*see, e.g., http://money.163.com/15/0129/13/AH4N7AAK00254TFQ.html*), SAIC faulted Alibaba Group for failing to take effective measures to address a range of problems, including against trademark infringement, for requiring parties to waive claims to operator liability, and for imposing unreasonable burdens on consumers who wish to file complaints.

dialogue to address concerns raised in the SAIC report. In addition to the SAIC report, Taobao appeared in three of the top ten cases named by the National Copyright Administration of China in its 2014 "Sword Net Action Campaign." The three separate cases, involving pirated movies and other audiovisual products as well as software, are under the jurisdiction of local Ministries of Public Security in Jiangsu, Shandong, and Hubei provinces. USTR is concerned about these developments but does not re-list Taobao at this time. USTR encourages the company to continue working with all stakeholders to address ongoing complaints, will continue to monitor the situation.

The two most notorious peer-to-peer sites associated with Bulgaria, **Zamunda.net** (also operating as **Zamunda.se** and previously as **Zelka.org**) and **Arenabg.com**, remain operational, offering pirated online movies, music, software, and video games, despite police and court action against them. The sites reportedly log thousands of unique entries (upload and download) daily by users from Bulgaria and the region. The appeal of a criminal conviction against Arenabg.com ended in 2013 with the acquittal of all four defendants, who initially had each been fined less than $700 by Sofia Regional Court. The latest trial involving Zamunda.net began in late 2014 in Sofia Regional Court. Although Bulgarian police have made meaningful efforts to take enforcement action against the operators of these markets, prosecutors and the courts have not yet been able to produce deterrent penalties against these operators. However, in recognition of Bulgarian law enforcement efforts[14] and recent reports that the operators of these sites agreed with rights holders to remove links to unauthorized movies upon notification, the sites are not listed below. USTR will continue to monitor this situation.

---

[14] According to Bulgarian officials, inspectors cut access to over 20,000 files of illegal content on zamunda.net, zamunda.se, arenabg.com and another peer-to-peer site, VBox7, in 2014.

## New Issue Focus:  Domain Name Registrars

This year, USTR is highlighting the issue of certain domain name registrars.  Registrars are the commercial entities or organizations that manage the registration of Internet domain names, and some of them reportedly are playing a role in supporting counterfeiting and piracy online.

In general, it is critical for rights holders to be able to enforce their rights, including through civil and administrative procedures, cooperation with law enforcement in criminal actions, and through the Internet Corporation for Assigned Names and Numbers' ("ICANN") procedures and policies.[15]  However, the IPR enforcement system can break down when the tools available to rights holders become ineffective, due to, among other things, the failure of domain name registrars or other similarly situated entities to follow rules intended to help combat illicit activity.

The agreement between ICANN and domain name registrars[16] requires that registrars take action when notified of illicit activity occurring on a website whose domain name they have registered.  Some registrars, however, reportedly disobey court orders and other communications, including from government enforcement authorities.  Some registrars apparently even advertise to the online community that they will not take action against illicit activity, presumably to incentivize registrations by owners and operators of illicit sites.  These entities reportedly refuse to abide by the rules that are designed to foster legitimate activity on the Internet, and instead help to create an atmosphere of lawlessness that adversely affects others, often profoundly.

Several respondents to the 2014 *Federal Register Request* identified registrars that purportedly facilitate the distribution of unauthorized copyright-protected content.  One respondent identified several registrars that have apparently refused requests to lock or suspend domain names used to

---

[15] For information on ICANN's policies and procedures, please visit *www.stopfakes.gov/news/protecting-trademarks-domain-names*; and *www.icann.org/resources/pages/complaints-2013-03-22-en.*

[16] ICANN's Registrar Accreditation Agreements are available at *www.icann.org/resources/pages/approved-with-specs-2013-09-17-en*; and *www.icann.org/resources/pages/ra-agreement-2009-05-21-en.*

sell suspected counterfeit pharmaceuticals to consumers worldwide.[17]  This conduct also presents a public health challenge, and requires a coordinated response by governments and a variety of private sector stakeholders.

According to one report, an estimated 96 percent of online pharmacies targeting U.S. consumers are operating in violation of applicable U.S. law and standards.[18]  An estimated 50 percent of websites worldwide that hide their physical address are selling illicit pharmaceuticals,[19] including those labeled with counterfeit trademarks.  The website *www.LegitScript.com* has reviewed over 40,000 online drug sellers, but found fewer than 400 to be legitimate.  Studies have found that counterfeit anti-cancer, anti-HIV/AIDS, and other medications are not only ineffective, but in some cases may contain toxic or deadly adulterants, such as rat poison.[20]

With relatively few lawful sources amidst a sea of harmful ones, the public faces a substantial risk when navigating these online pharmaceutical markets.  In addition to the public health and safety risks, there is also economic harm.  Illegal online pharmaceutical sellers can generate

---

[17] The Alliance for Safe Online Pharmacies' ("ASOP") filing referenced LegitScript.com, a pharmacist-affiliated online pharmacy verification authority, that also publishes lists of reportedly illicit online drug sellers and unresponsive domain name registrars.  ASOP nominated for inclusion in the 2014 List several of the same registrars identified by LegitScript.  For details on the selection process and the current registrar and pharmacy lists as well as other important information regarding online pharmacies, please visit: *http://www.legitscript.com/pharmacies/top-rogues;* and *https://blog.legitscript.com/2014/10/top-10-rogue-registrars-october-2014*.  Additional consumer information regarding online pharmacies can be found at the following websites:  *http://safeonlinerx.com*; *www.safemedsonline.org*; and *www.nabp.net/programs/accreditation/vipps*.  While these sites focus primarily on the U.S. audience, similar resources are available to consumers outside the United States, including at *http://asop.eu/home*.  Related U.S. Government resources and information, including on voluntary initiatives spearheaded by the Executive Office of the President's U.S. Intellectual Property Enforcement Coordinator, are available at:  *www.whitehouse.gov/sites/default/files/omb/IPEC/2013-us-ipec-joint-strategic-plan.pdf* (page 35); and *www.fda.gov/Drugs/ResourcesForYou/ucm080588.htm*.

[18] National Association of Boards of Pharmacy (NABP), *http//safeonlinerx.com/wp-content/uploads/2012/07/nabp-internet-drug-outlet-identification-program-report_apr2010.pdf*) (page 4).  This report includes troubling statistics regarding over 5,000 online drug outlets "Not Recommended" by the NABP as trustworthy sources of pharmaceutical products.  Please also see the U.S. Government Accountability Office <u>Report on Internet Pharmacies</u> at *www.gao.gov/assets/660/655751.pdf*.

[19] World Health Organization, *www.who.int/mediacentre/factsheets/fs275/en*.

[20] Interpol, *www.interpol.int/en/Crime-areas/Pharmaceutical-crime/The-dangers.*

significant revenues each month, diverting income from legitimate innovative and generic pharmaceutical manufacturers, and depriving governments of tax revenues from legitimate sales.

Registrars can play a critical public safety role in the Internet ecosystem. Ignoring that role, or acting affirmatively to facilitate public harm, is of great concern. One of the registrars nominated in response to USTR's *Federal Register Request*, **Tucows.com**, appears in the List below, as an example of this concern. USTR urges trading partner governments[21] and ICANN to investigate and address this very serious problem.

## <u>Results of the 2014 Out-of-Cycle Review of Notorious Markets</u>

As noted, the List identifies particular online and physical markets in which pirated or counterfeit goods are reportedly available, but it does not constitute a legal finding or a conclusion as to IPR protection and enforcement in a host country or economy, nor is it intended to be an exhaustive listing of all notorious markets around the world. Rather, the List highlights some of the most prominent examples reported and examined during the OCR process.

Owners and operators of the Notorious Markets included in the 2014 List that are willing to address piracy and counterfeiting have many options for doing so. Such owners and operators can adopt business models that rely on the licensed distribution of legitimate content, and can negotiate appropriate licenses with rights holders. If an otherwise legitimate business has become a platform for piracy, the owner or operator can work with rights holders and enforcement officials to help curtail acts of infringement. However, in the absence of such good faith efforts, responsible government authorities should investigate reports of piracy and counterfeiting in these and similar markets, and pursue appropriate action against such markets and their owners and operators.

---

[21] Increasingly, operators of online notorious markets are using Country Code Top Level Domains ("ccTLDs"), which are subject to greater government influence, rather than generic or gTLDs. Governments are strongly encouraged to take an active role in preventing the use of their ccTLDs to facilitate the sale and distribution of counterfeit and pirated products and services.

## Online Markets[22]

The 2014 List of online markets again includes examples of various technologies and business models. USTR based its selections not on specific technologies or business models but on whether, based on available information, a nominated site or affiliated network of sites appears to engage in or facilitate IPR infringement. Accordingly, the 2014 List reflects nominations of sites that reportedly engage in copyright piracy and trademark counterfeiting as well as registrars that reportedly facilitate the distribution of pirated and counterfeit products, including medicines. In addition to facilitating IPR infringements, sites may lack safeguards for consumer privacy, security and safety, and some reportedly actively and surreptitiously install malware on users' computers.

**4shared.com**: With millions of unique visitors each day, this popular site, reportedly based in the British Virgin Islands, facilitates streaming and downloads of pirated videos, music, books and games. 4shared mobile apps further allow users to stream infringing content to their mobile devices. While this site has implemented a feature that scans for unauthorized content, the music industry reports that levels of infringement are substantial and continue to increase.

**Baixeturbo.org**: This long-running U.K.-hosted blog site has been operating since 2008, and is very popular in Brazil. The site reportedly specializes in infringing music but also offers unauthorized copies of films and television programs. The site is said to generate revenue from advertisements and the sale of premium accounts that allow linking to multiple cyberlockers[23] where users can download infringing files.

---

[22] In most cases, the List identifies online markets by the domain name provided in the public responses to the *Federal Register Request*. However, it is common for operators of online Notorious Markets to change a site's domain name or to use multiple domain names at once to direct users to the main site. The List reflects each market's most commonly referred to or well-known domain name or names as of March 3, 2015.

[23] The cyberlockers identified in the List reportedly operate primarily to provide users with access to unauthorized content. Such sites are distinguishable from legitimate cloud storage services that allow consumers to lawfully store, share, backup, and access data. For more information on cyberlockers' role in facilitating piracy, please see *www.netnames.com/sites/default/files/pdfs/dca-netnames-cyber-profibility.pdf*.

**Bajui.com**:  While not popular on a global scale, for over five years Bajui, hosted in Canada, has reportedly been the source of allegedly infringing music made available to Spanish-speaking users through direct downloads.  While rights holders have used Spain's new copyright law to take enforcement action against Bajui and an even more popular site, **Elitetorrent.com**, both have been able to evade effective enforcement by removing specific links included in complaints and replacing those links with new ones to the same allegedly infringing content.  Bajui exemplifies the harm to music creators of pre-release piracy, while Elitetorrent provides links to unauthorized copies of movies and television programs.

**Catshare.net**:  This Polish site reportedly offers unauthorized alternatives to multiplayer platforms, the gaming industry's latest business model.  Sites such as this one, which reportedly offers unauthorized access to 36,000 infringing games, threaten the development of legitimate distribution models.

**Cuevana.tv (Storm)**:  In the last year, this Argentine site's operators have developed a new streaming application called "Cuevana Storm" that uses BitTorrent technology to allow users to stream allegedly infringing video content.  Rights holders in the movie industry report that an attempt to take action against the site more than four years ago has stalled, leaving them without effective recourse.

**Darkwarez.pl**:  Despite being highlighted in past Lists, Darkwarez reportedly continues to make available thousands of links to allegedly infringing video game content.  The site targets Poland and Polish-speaking audiences.

**Ex.ua** and **Extratorrent.cc**:  These sites, both of which have appeared on the List several times, continue to benefit from Ukraine's reported status as a haven for online piracy.  Extratorrent allegedly has extremely high rates of piracy with over 1.4 million unauthorized files, tens of millions of users, and almost ten billion unique visits in a single month.  While Extratorrent has been the subject of successful enforcement actions in the U.K., Italy, and Belgium, it maintains a global Alexa ranking of 345 and, notably, an Alexa ranking in India of 70, illustrating the commercial impact that sites which facilitate infringement can have on geographically diverse

14

markets. USTR encourages the Government of Ukraine to take lasting action against these and other sites that are operating within Ukraine's jurisdiction.

**Free-TV-video-online.me** (also operating as **Free-TV-video.me**): This site, reportedly hosted in Canada, provides links to unauthorized copies of first-run movies and television programs. This site has a worldwide Alexa rank of 759.

**Gigabytesistemas.com**, **E-nuc.com** and **Hardstore.com**: These sites, hosted in Spain (Gigabytesistemas and E-nuc) and the Republic of San Marino (Hardstore), are reportedly examples of those that facilitate the unauthorized use of copyright-protected games by selling "mod chips" or game copier hardware that consumers reportedly use to circumvent technological protection measures designed to promote authorized uses.

**KickassTorrents** (also operated as **Kickass.to**): This BitTorrent indexing site continues to be one of the most popular, regardless of the name under which it currently operates. Its standing rose in the wake of the December 2014 takedown of its rival, **ThePirateBay.se**. Reportedly based in Canada, over the past several years the site operators have changed the domain name numerous times, obscured or hidden their locations, and have used multiple servers in various countries to evade or otherwise frustrate enforcement actions. The site originally operated as **Kat.ph**, until Philippine authorities took enforcement action. The .so registry seized the domain Kickass.so on February 9, 2015, also setting a positive example for other registries to follow. The site's illegal activities, however, resumed under Kickass.to shortly thereafter.

**Molten-wow.com**: This site reportedly provides over 20,000 users with unauthorized access to a popular multiplayer online role-playing game in exchange for financial donations. In providing such access, the site allegedly hacks versions of the publisher's client software and anti-circumvention controls, and employs infringing copies of the publisher's server software. The site reportedly has been operating since 2009, and has been unresponsive to the video game industry's enforcement efforts.

**Movshare Group/Private Layer** (operating as **Torrentz.eu**, **Torrentz.me**, **Torrentz.ch**, **Torrentz.in**, **Putlocker.is**, **Nowvideo.sx**, **Movshare.net**, **Bitsnoop.com**, **Novamov.com**, among others):  This group of affiliated and extremely popular sites, with ties to Switzerland, Netherlands, Panama, Canada, and other countries, reportedly uses multiple technologies to make available countless unauthorized copies of movies, games, music, audiobooks, software, and sporting event broadcasts.  The sites are said to generate revenues through advertising and membership or subscription fees, and compensate users for uploading infringing content.  Switzerland has announced plans to close a loophole in its law that restricts enforcement against pirate sites.  However, at this time, rights holders report that Switzerland is an increasingly popular host country for such sites.

**Rutracker.org** (formerly Torrents.ru) and **Rapidgator.net**:  The operators of these sites that reportedly facilitate piracy have allegedly based their operations in Russia to evade enforcement.  Rutracker.org, hosted in and operated from Russia, is the country's 17th most popular site, according to Alexa.com.  Rapidgator, the popularity of which is declining, is hosted in Russia but primarily serves users outside of the country.  Both of these sites have appeared in the List multiple times.

**Tucows.com**:  Based in Canada,[24] Tucows is reportedly an example of a registrar that fails to take action when notified of its clients' infringing activity.[25]  Consistent with the discussion above, USTR encourages the operators of Tucows to work with relevant stakeholders to address complaints.

**Ulozto.cz:**  This cyberlocker allegedly hosts and distributes more than 50 million files, many of which reportedly infringe copyrights in music and film.  The site is most popular in the Czech Republic where it is hosted and has an Alexa ranking of 29.  The music industry reports that

---

[24] USTR received information regarding Canadian online pharmacies in response to our *Federal Register 2015 Special 301 Request for Public Comments*.  For more information, please refer to *www.federalregister.gov*, Docket Number USTR-2014-0025.

[25] Although Bizcn.com (also operating as Cndomainsite.com) was also nominated for inclusion in the List based on concerns similar to those reported for **Tucows**, it appears that the operator of Bixcn.com has recently undertaken efforts to address these serious problems.  USTR welcomes this apparent positive development but urges Bizcn to sustain and expand this important effort.

attempts to work with Ulozto.cz to legitimize its business and develop a licensed music platform have failed.

**Uploaded.net**: This cyberlocker, with alleged connections to Switzerland and Netherlands, provides access to a broad range of unauthorized copies of copyright-protected materials, and reportedly generates over $6 million per year in advertising and subscription revenues. The site operator allegedly employs multiple IP addresses, domain names, and server locations to evade law enforcement.

**vK.com** (also known as **vKontakte.com**): Although its ownership has changed, vK.com has continued to operate as an extremely popular social networking site in Russia and neighboring countries. Social networking sites can serve as a uniquely valuable communication platform, enabling beneficial commercial, cultural, and social exchanges. Most successful social networking sites do so in ways that do not involve the active facilitation of copyright infringement. However, some site operators continue to generate revenues by enabling the unauthorized sharing of music and other content through their sites and associated software applications. vK's operators responded to the *Federal Register Request* with information about their anti-piracy efforts, but the reported continuing scope and volume of infringing content demonstrates that more needs to be done to yield positive change.

**Yts.re** (also known as **YIFY**): With millions of unique visitors each month and a rising global Alexa ranking in the low 700s, Yts.re is a popular site for allegedly pirated movies. Yts.re reportedly facilitates piracy through high quality movie downloads and evades enforcement through multiple IP addresses, and by basing its operations in multiple countries. Yts.re's operators also created a desktop torrent streaming application called "Popcorn Time," similar to "Cuevana Storm" (listed above). The "Popcorn Time" application mimics popular legitimate subscription-based streaming services but, instead of authorized films, users download reportedly infringing movies using BitTorrent technology and can further distribute the infringing content to others. While the original "Popcorn Time" application may no longer be available, spin-offs—or "forks"—of the application continue to be developed under variations of the popular "Popcorn Time" name.

**Yyets.com** (operating as **Zimuzu.tv**):  Described by some commenters as the most popular dedicated website for copyright infringing materials in China, Yyets.com has reportedly shut down at key times, including on or about April 26th, World Intellectual Property Day, and after being nominated for inclusion in this year's List.[26]  Visitors to Yyets.com currently are redirected to Zimuzu.tv, which appears to offer unauthorized streaming of copyright-protected television programs and movies.

**Zing.vn**:  Vietnam-based Zing.vn, primarily a social media site, reportedly continues to facilitate access to unauthorized music files.  Years of negotiations to legitimize its content distribution have still not yielded significant results.  Due to the lack of civil and criminal enforcement options against websites in Vietnam, industry filed a copyright infringement case in the United States against Zing.vn's operator, VNG; however, in January 2014, the court dismissed the case on jurisdictional grounds.  This highlights the need for Vietnam to establish effective enforcement mechanisms to address online copyright infringement.

**Zippyshare.com**: This site is well-known for downloads and distribution of allegedly infringing music.  The site offers features that make piracy more "infringer friendly," including through accelerated downloading.  Zippyshare is reportedly operated from Poland and hosted in France.  Its revenues reportedly come from paid advertising, which targets the millions of users who download files from the site.

**Physical Markets**

The Internet has brought about a global revolution in the authorized and unauthorized distribution of films, music, software, video games, and books.  In many markets, unauthorized online distribution of, or access to, copyright-protected content largely has replaced unauthorized distribution via physical media.  In other markets, however, physical media (including CDs, DVDs, video game cartridges, and pre-loaded computer hard drives and other storage devices)

---

[26] Chinese administrative authorities have issued penalties against **Yyets.com** and other online markets.

continue to be prevalent, with widespread distribution, at times involving local manufacture, through markets such as those identified below.

The Internet also makes available innumerable sites that facilitate the distribution of counterfeit products to consumers worldwide. The volume of individually consigned shipments of counterfeit merchandise from the country of origin to the global community of consumers is growing.[27] However, Internet connectivity and broadband limitations, costs and other obstacles related to shipping and postal delivery, as well as customs and other regulatory controls, often serve as barriers to e-commerce, regardless of whether the merchandise is authorized or counterfeit. Consequently, physical markets, such as the ones listed below, remain the primary distribution channels for pirated and counterfeit goods and services in much of the world.

In response to the 2014 *Federal Register Request*, USTR received fewer nominations for physical markets than in the past. However, several of the nominations identified China as the primary source of counterfeit products. Worldwide, from the Americas, to Africa, to Eastern Europe, and in Southeast Asia, Chinese-origin counterfeit goods find their way into markets, businesses, and homes. In some cases, parties with ties to China manage the wholesale and retail distribution channels that facilitate the flow of counterfeit merchandise, including to markets such as Prado, Italy; Lagos, Nigeria; Ciudad del Este, Paraguay; and Bangkok, Thailand.

In a global environment, enforcement against unscrupulous retailers, although important, will not be sufficient to reduce the flow of counterfeit products. The importance of effective border controls to prevent exportation of counterfeit goods from their countries of manufacture, to prevent importation into the destination country, and to prevent such goods from transiting third countries on their way to destination countries cannot be overstated. Another key to reducing piracy and counterfeiting, however, lies in the ability to influence demand and redirect the consumers who knowingly participate in illicit trade to legitimate alternatives.

<u>Argentina</u>

---

[27] For example, the European Union recently enhanced its border enforcement authority to address the increase in trafficking of counterfeit goods via small, postal or express courier consignments. Please see *http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:52005DC0479*.

**La Salada (Buenos Aires)** continues to operate as South America's largest black market. Sellers of counterfeit and pirated products deal openly because enforcement reportedly has been small-scale and intermittent, at best. Despite appeals by both the United States government and the European Commission to address counterfeiting and piracy in La Salada, the Government of Argentina reportedly tolerates the sale of contraband at the market.[28] Press reports indicate that the market's owners now operate a companion online market, LaSalada.com.

Brazil

**Galeria Page (Sao Paulo)** and the surrounding 25 de Marco Area, Sao Paulo's largest market for counterfeit goods, has reportedly seen an increase in illicit commerce. Sao Paulo's "City Free of Piracy" project was heralded for the positive impact it had locally and throughout Brazil, but a 2013 change in city leadership brought about a shift in focus away from IPR enforcement. The authorities reportedly have conducted some raids against street vendors in the area; however, counterfeiting and piracy appear to be thriving inside and around the buildings at Galeria Page. While USTR acknowledges the efforts of law enforcement agencies and the fiscal environment that may have precipitated the shift in focus, we urge political support for resuming enforcement in and around this flagship market.

China

Physical markets in China continue to facilitate the distribution of significant quantities of counterfeit merchandise for consumption in China and abroad. Some of these markets are well-known, and according to reports, offer an extensive catalogue of products, and will arrange for on-demand manufacture and worldwide shipping of counterfeit products. Some markets have adopted policies and procedures intended to address the availability of counterfeit merchandise, but these are not vigorously enforced by the markets. At the same time, a number of online markets in China have been the subject of deterrent enforcement actions in China's courts, and in many cases Chinese authorities do engage in routine enforcement actions in physical markets as

---

[28] Representatives of La Salada reportedly accompanied the President of Argentina on trade missions abroad. Past administrations have also appeared to tolerate the counterfeiting and piracy at La Salada. Please see *www.economist.com/news/americas/21594998-inside-south-americas-largest-informal-market-stall-stories*.

well.  The United States welcomes these efforts and recommends their expansion to combat more effectively the scale of the reported problem both in China and worldwide.

The following Chinese markets are key contributors to counterfeiting:

According to reports, **Jin Long Pan Foreign Trade Garment Market (Guangzhou)**, wholesales low-quality, relatively inexpensive counterfeit versions of American and other branded apparel and footwear for export to Africa and the Middle East, in particular.

Counterfeit products, predominantly apparel, footwear, and fashion accessories, including sunglasses, perfumes, and handbags, reportedly continue to dominate the offerings at **Jinshun Garment Market (Guangzhou)**.  Recent reports indicate that nearly every shop sells exclusively counterfeit goods.

The **Qi Pu Market (Shanghai)** is a wholesale clothing market, housed in five seven-story buildings, offering a wide array of apparel and accessories.  Many sellers reportedly conceal their counterfeit products from plain sight.  Upon request, customers are reportedly escorted to locations within the market where finished counterfeit products are available for examination and purchase, including in commercial quantities for export.

Many retail vendors at the **Silk Market (Beijing)** reportedly distribute counterfeit consumer and industrial products to Chinese and foreign buyers.  Illicit activities reportedly continue at the Silk Market despite welcome efforts by Chinese authorities to work with management and engage in enforcement actions, and even though some rights holders have successfully sued the market's operators.  Vendors at the Silk Market reportedly have access to a supply of newly-manufactured counterfeit products to replace those that have been confiscated, and their profits appear to far exceed financial penalties that have been imposed on them.  It appears that past civil and administrative enforcement efforts, although imposing some costs, have not actually ended infringement.

All of the shops at **Zengcheng International Jeans Market (Zengcheng)** reportedly represent factories and sell to retail and wholesale clients in China and worldwide, particularly in Africa. Most shops at the market also claim to sell counterfeit merchandise on Taobao.com.

Ecuador

Pirated DVDs, CDs, and software, clothing with counterfeit logos, and counterfeit electronic items remain widely available for sale in **La Bahia Market (Guayaquil)**. The occasional administrative enforcement efforts that occur at the market focus mainly on protecting domestic IPR, and are insufficient to address the overall problem. The current absence of criminal penalties for counterfeiting and piracy makes Ecuador an attractive host for organized criminal activity.

India

Numerous markets in India have appeared in past Lists, with no identified meaningful, effective response by the Indian government. The United States continues to raise the importance of IPR protection and enforcement with India, underscoring the need to combat counterfeiting and piracy in both online and physical markets. The United States encourages India to take sustained and coordinated enforcement action at the **Nehru Place (New Delhi)**, previously-listed markets, and numerous other non-listed markets in its territory.

Indonesia

**Harco Glodok (Jakarta)** is Indonesia's largest trade center for consumer electronics and related goods. This market reportedly also serves as the retail distribution point for a complex piracy and counterfeiting network. The Government of Indonesia's efforts over the past few years have failed to rid this otherwise legitimate market of IPR-infringing goods and services. USTR urges the Indonesian Government to launch a sustained, coordinated, and effective effort to tackle widespread counterfeiting and piracy at Harco Glodok and elsewhere.[29]

---

[29] Other markets in Indonesia, including those named in previous Lists, were not identified in response to this year's *Federal Register Request*, but nonetheless require attention.

<u>Mexico</u>

In the 2014 Notorious Markets process, Mexico ranked first in terms of number of nominated markets. Although several rights holders commented positively on the IPR enforcement efforts of Mexican authorities at the **Tepito (Mexico City)** and **San Juan de Dios (Guadalajara)** markets, significant levels of piracy and counterfeiting reportedly continue in these, and reportedly in dozens of other markets across Mexico. The United States encourages Mexico to continue coordinated law enforcement efforts, including against high-level targets in the distribution chain, to reduce the availability of counterfeit and pirated product in markets across the country. We further encourage Mexico to empower customs officials to interdict infringing imports on their own authority as well to enforce against counterfeit and pirated goods moving in-transit.

<u>Nigeria</u>

The situation in Nigeria exemplifies why both effective import controls at the destination market and export controls at the country of origin are essential in stopping the flow of counterfeit and pirated goods. Nigerian authorities face challenges in allocating sufficient resources and building the necessary infrastructure to engage in effective import controls against the tide of foreign-manufactured counterfeit products. In addition, Nigeria-based piracy operations that target both foreign and Nigerian films and music present challenges for authorities.

**Computer Village Market (Ikeja, Lagos State)** is known to be the largest market for knockoff computer products and accessories in Nigeria. Raids by regulators continue, but up to an estimated 80 percent of the wide variety of electronic devices, music, movies, and other products available here are counterfeit or pirated. Store owners reportedly cooperate with each other to frustrate or prevent enforcement activities. Enforcement in this market is considered dangerous.

Counterfeit and substandard household items and appliances, are available in the **Ebutte Ero Market (Lagos Island, Lagos State)**. IPR enforcement here is not a priority for resource-challenged regulators. The market has been described as tightly organized and difficult to monitor, and enforcement would be a challenge even if resources were available. Stopping

counterfeit goods at borders, before they reach the retail distribution level, may be an effective way to address markets such as this.

Sale of counterfeit soft drinks, spirits and popular consumer goods is prevalent in the **Oke-Arin & Apongbon Markets (Lagos Island, Lagos State)**.  Regulatory agencies have conducted raids and made some arrests, but the chaotic nature of this densely populated market makes enforcement difficult.

Paraguay

**Ciudad del Este, Paraguay** has been named in either the List or the Special 301 Report for over 15 years.  Regional organized crime groups are reportedly trafficking in counterfeit and copyright-infringing goods in Ciudad del Este.  The border crossing at Ciudad del Este and the city itself reportedly have served as a hub for the distribution of counterfeit and pirated products in the Brazil-Argentina-Paraguay triple frontier region and beyond.  During the past 18 months, the Cartes Administration, primarily through the National Directorate of Intellectual Property (DINAPI), General Enforcement Directorate and partner law enforcement agencies, has engaged in several enforcement efforts.  The United States applauds the Cartes Administration's goal of transforming Ciudad del Este into a legitimate marketplace, with all its attendant benefits.  While Paraguay's recent efforts merit acknowledgement, years of relative inattention have created a situation in Ciudad del Este that will require further coordinated and sustained enforcement efforts to resolve.

Thailand

IPR holders face a difficult environment in Thailand due to the large number of markets offering counterfeit and pirated goods and services, and a relative lack of enforcement.   Last year, USTR identified 13 Thai markets in the List.  We appreciate the Government of Thailand's efforts over the past year and for the enforcement statistics it provided in response to the *Federal Register Request*.  However, reports indicate that pervasive counterfeiting and piracy continue in all of the previously-listed markets, including at **Talad Nat on Wireless Road (Bangkok)**, near the U.S. Embassy.  USTR requests that Thai authorities conduct sustained, coordinated enforcement

actions at the "Red Zone" markets listed in last year's report, or at any nominated markets in which counterfeiting and piracy are rampant.  USTR will continue to monitor the situation.

Uruguay

Despite Uruguay's otherwise positive reputation for respecting IPR, there has been an increase in reports of counterfeiting and piracy in its **Free Trade Zones** ("FTZs"), including **Florida Sur** and **Libertad**.[30]  USTR encourages the Government of Uruguay to work with rights holders to address concerns regarding counterfeit goods, including footwear and apparel, being trafficked in its FTZs.  USTR will continue to engage with Uruguay on this issue.

## **Public Information**

The 2014 Notorious Markets List is the result of the fifth OCR of Notorious Markets, which was initiated on September 26, 2014, through a *Federal Register Request for Public Comments*.  The request and responses are available at *www.federalregister.gov*, Docket Number USTR-2014-0017.  USTR developed the 2014 List in coordination with the Federal agencies represented on the Special 301 Subcommittee of the Trade Policy Staff Committee (TPSC).  Information about Special 301, the TPSC, and other intellectual property rights-related processes and issues is available at *https://ustr.gov/issue-areas/intellectual-property*.

To assist U.S. rights holders and consumers who confront IPR infringement online, the U.S. Government continues to expand the tools available on *www.STOPfakes.gov* including by providing links to infringement reporting mechanisms at a number of popular online retailers and markets.   These resources are available at *www.STOPfakes.gov/business-tools/retailer-reporting*.  Victims and interested parties may report IPR theft to U.S. law enforcement agencies either through a link at *www.STOPfakes.gov* or directly at *www.iprcenter.gov/referral*.

*****

---

[30] Information on the general challenge of enforcing IPR in FTZs is available at *www.iccwbo.org/Advocacy-Codes-and-Rules/BASCAP/International-engagement-and-Advocacy/Free-Trade-Zones.*